2005-NMCA-097

116 P.3d 861

**HEALTHSOURCE, INC.,**
**Plaintiff–Appellant,**

v.

**X–RAY ASSOCIATES OF NEW MEXICO, P.C., and Jerome Burstein, M.D., Defendants–Appellees.**

No. 24,589.

Court of Appeals of New Mexico.

June 9, 2005.

Certiorari Denied, No. 29,312, July 21, 2005.

Lorna M. Wiggins, Patricia G. Williams, Wiggins, Williams & Wiggins, P.C., Albuquerque, NM, for Appellant.

Geoffrey D. Rieder, Travis G. Jackson, Rieder & Associates, Albuquerque, NM, for Appellee X–Ray Associates of New Mexico, P.C.

Anne Marie Turner, Huffaker & Conway, P.C., Albuquerque, NM, for Appellee Jerome Burstein, M.D.

## OPINION

PICKARD, Judge.

{1} Healthsource, Inc. (Plaintiff) appeals from a district court's order dismissing its lawsuit against X–Ray Associates and Dr. Jerome Burstein (Defendants). Plaintiff sued Defendants for breach of contract, tortious interference with contractual relations, civil conspiracy, negligent misrepresentation, and prima facie tort. Both Defendants filed motions to dismiss Plaintiff's complaint, with each motion claiming that Plaintiff lacked standing to bring suit against Defendants or that Plaintiff had failed to state claims upon which relief could be granted. The district court granted Defendants' motions to dismiss on December 10, 2003. On appeal, Plaintiff argues that the district court erred by ruling that Plaintiff did not have standing to assert the claims against Defendants, and that the court also erred when it determined that Plaintiff had not stated claims upon which relief could be granted. In their answer brief, Defendants contend that Plaintiff's appeal as to Dr. Burstein was filed premature-

ly, and therefore this Court lacks jurisdiction to hear that portion of the appeal. We conclude that this Court does have jurisdiction to hear this appeal. We also hold that the district court did not err in dismissing Plaintiff's complaint because Plaintiff lacked standing to bring the claims against Defendants or Plaintiff failed to state claims upon which relief could be granted. Thus, we affirm.

## FACTS AND BACKGROUND

{2} Plaintiff is a New Hampshire corporation. Until January 15, 2003, it owned 100% of the stock of Lovelace Health Systems, Inc. (Lovelace), a New Mexico corporation. CIGNA Health Corporation owns 100% of Plaintiff's stock. In turn, CIGNA Corporation owns all of the stock of CIGNA Health Corporation.

{3} At some point prior to July 2002, Plaintiff agreed to sell all of its Lovelace stock to Ardent Health Services (Ardent). Plaintiff and Ardent entered into a purchase agreement, which set the closing date for the sale as December 31, 2002. The purchase price that Ardent paid Plaintiff for Lovelace's stock was nearly a quarter of a billion dollars.

{4} Defendant Dr. Burstein is a physician who was employed by Lovelace as the Chair of Lovelace's Radiology Department. Dr. Burstein was employed by Lovelace from 1982 until December 30, 2002. In June or July 2002, Dr. Burstein became aware that Plaintiff's sale of Lovelace stock to Ardent was expected to close by the end of 2002. On December 13, 2002, Dr. Burstein left a voice mail message for Dr. Richard Rolston, Chief Executive Officer and Chief Medical Officer of Lovelace, informing Dr. Rolston that he intended to resign his employment with Lovelace and to commence employment with Defendant X–Ray Associates (X–Ray), which provides radiology services to various health facilities in New Mexico. Dr. Burstein also informed Dr. Rolston that X–Ray had decided to offer positions to all Lovelace radiologists.

{5} In late December 2002, Dr. Rolston was informed by Keith Winterkorn, President of X–Ray, that X–Ray had signed up all of Lovelace's radiologists and X–Ray planned to use the enlistment of Lovelace's radiologists as "leverage" to force Ardent to contract with X–Ray for radiology services. Upon learning of X–Ray's attempt to employ the entire Lovelace radiology staff, Ardent informed Plaintiff that it would not agree to close the sale of Lovelace stock until the situation regarding Lovelace's radiology department was settled.

{6} On December 31, 2002, Lovelace filed a lawsuit against X–Ray and Dr. Burstein. Lovelace's complaint alleged that Dr. Burstein and X–Ray had interfered with employment agreements between Lovelace and its radiology staff by soliciting the staff to work for X–Ray and that Dr. Burstein and X–Ray had conspired for this purpose. The complaint further claimed that Dr. Burstein had breached his confidentiality agreements with Lovelace and that X–Ray had unfairly competed with Lovelace in attempting to hire away Lovelace's radiology staff. On the day that Lovelace filed it lawsuit, it also filed for a temporary restraining order, requesting that Dr. Burstein and X–Ray be enjoined from using any of Lovelace's confidential business and employee information in an effort to solicit Lovelace radiologists to leave their employment with Lovelace and to commence employment with X–Ray. The district court granted the temporary restraining order, after which Ardent and Plaintiff closed on the purchase of Lovelace stock. Yet, the closing date of the sale was delayed until January 15, 2003, which was fifteen days after the sale had originally been set to close.

{7} After the sale of Lovelace stock had been completed, Lovelace amended its original complaint to add Plaintiff as a party to the complaint. On March 11, 2003, the district court entered a stipulated order dismissing, without prejudice, all claims that Lovelace had brought against X–Ray, which was followed on March 26, 2003, with a stipulated order dismissing, without prejudice, all claims that Lovelace had brought against Dr. Burstein. After Lovelace had dismissed its claims against X–Ray and Dr. Burstein, X–Ray filed a motion pursuant to Rule 1–012(B)(6) NMRA to dismiss the complaint, alleging that Plaintiff lacked standing to sue X–Ray. In its motion, X–Ray argued that

Lovelace was the real party in interest and that any claims Plaintiff had set out in the complaint were derivative of duties owed to Lovelace, not Plaintiff. The district court denied the motion to dismiss, but it did order Plaintiff to amend the complaint to state claims that belonged to Plaintiff and not Lovelace.

{8} Plaintiff's second amended complaint alleged breach of contract on the part of Dr. Burstein and stated causes of action against X–Ray and Dr. Burstein for tortious interference with existing contractual relationships, civil conspiracy, negligent misrepresentation, and prima facie tort. After Plaintiff filed its second amended complaint, Dr. Burstein filed a counterclaim alleging that Plaintiff had defamed him in its complaint. In addition, both Defendants filed Rule 1–012(B)(6) motions to dismiss Plaintiff's second amended complaint. The district court granted Defendants' motions to dismiss Plaintiff's second amended complaint on December 10, 2003, in an order that did not address Dr. Burstein's counterclaim against Plaintiff. Plaintiff filed its notice of appeal on December 17, 2003. On January 30, 2004, the district court issued an order dismissing Dr. Burstein's counterclaim against Plaintiff. Plaintiff did not file another notice of appeal as to Dr. Burstein.

{9} On appeal, Plaintiff claims that the district court erred when it dismissed its complaint against Defendants because it is the real party in interest in the causes of actions it filed in its second amended complaint and it has properly stated claims on which relief could be granted. In addition to the merits of these issues, Defendants argue that because the appeal in this case was filed before a final order was issued by the district court, this Court lacks jurisdiction to hear the appeal as to Dr. Burstein.

## DISCUSSION

{10} We will begin our discussion by analyzing whether this Court has jurisdiction to hear this appeal, after which we discuss Plaintiff's breach of contract claim. We will then address each of Plaintiff's tort claims separately.

1. *This Court has jurisdiction to hear this entire appeal.*

{11} Defendants argue that this Court lacks jurisdiction to hear the appeal as to Dr. Burstein because Plaintiff's appeal was filed before the district court entered a final judgment as to Dr. Burstein. Defendants argue that the district court's order filed on December 10, 2003, from which Plaintiff appealed, was not a final judgment because the order adjudicated only Plaintiff's claims against Defendants and not Dr. Burstein's counterclaim against Plaintiff. Defendants state that Plaintiff's appeal, which was filed on December 17, 2003, was filed prematurely and that Plaintiff should not have filed an appeal until after January 30, 2004, which is the date that the district court dismissed Dr. Burstein's counterclaim against Plaintiff.

{12} To support their assertion that the December 10, 2003, order was not a final judgment, Defendants cite to *Montoya v. Anaconda Mining Co.*, 97 N.M. 1, 3, 635 P.2d 1323, 1325 (Ct.App.1981), *overruling recognized by San Juan 1990–A, L.P. v. El Paso Production Co.*, 2002–NMCA–041, 132 N.M. 73, 43 P.3d 1083, which held that a "judgment or order is not final unless all the issues of law and of fact necessary to be determined, were determined, and the case completely disposed of so far as the court has power to dispose of it." *Montoya*, 97 N.M. at 3, 635 P.2d at 1325 (internal quotation marks and citation omitted). Our Court in *Montoya* also held that appellate review is limited to a final order or judgment. *Id.* Defendants also direct our attention to Rule 1–054(B)(1) NMRA, which provides that:

> when more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim or third-party claim, the court may enter a final judgment as to one or more but fewer than all of the claims only upon an express determination that there is no just reason for delay. In the absence of such determination, any order or other form of decision, however designated, which adjudicates fewer than all the claims shall not terminate the action as to any of the claims and the order or other form of decision is subject to revision at any time before the

entry of judgment adjudicating all the claims.

{13} Defendants assert that because the December 10, 2003, order did not resolve all the claims before the district court, the order could be considered final as to Dr. Burstein pursuant to Rule 1–054(B)(1) only if the district court had expressly determined that there was no just reason for delay. Here, because the district court did not make this determination, Defendants contend that the order was not final. Defendants also argue that pursuant to Rule 12–201(A)(2) NMRA, Plaintiff had thirty days from January 30, 2004, which was the date Dr. Burstein's counterclaim was dismissed, to file an appeal with this Court, and because Plaintiff did not file the appeal in that time frame, the appeal as to Dr. Burstein should be dismissed for lack of jurisdiction. Although we agree in part with Defendants that the December 10, 2003, order was not a final order or judgment as to Dr. Burstein, we disagree that this Court lacks jurisdiction to hear this appeal.

{14} Rule 1–054(B)(2) makes the order final as to X–Ray. Rule 1–054(B)(2) provides:

> When multiple parties are involved, judgment may be entered adjudicating all issues as to one or more, but fewer than all parties. Such judgment shall be a final one, unless the court, in its discretion, expressly provides otherwise and a provision to that effect is contained in the judgment.

In this case, the district court adjudicated all issues regarding X–Ray when it entered its order to dismiss on December 10, 2003. Unlike Dr. Burstein, X–Ray had not filed a counterclaim against Plaintiff, and therefore the district court's dismissal of Plaintiff's second amended complaint resolved all the claims involving X–Ray. Furthermore, the district court did not expressly provide within the order that the judgment was not final. Thus, although Defendants do not argue to the contrary, we clarify that pursuant to Rule 1–054(B)(2), the December 10, 2003, order was final as to X–Ray and this Court has jurisdiction over the portion of the appeal that deals with X–Ray.

{15} Yet, the district court's December 10, 2003, order did not resolve all issues involving Dr. Burstein, because Dr. Burstein's counterclaim against Plaintiff was not adjudicated by the December 10, 2003, order. Thus, Rule 1–054(B)(1) and Rule 1–054(B)(2) do not provide a basis for concluding that the December 10, 2003, order was final as to Dr. Burstein. However, it is this Court's practice, when a notice of appeal is filed prematurely, to take jurisdiction if the final order is entered during the early pendency of the appeal. For example, in many calendar notices, we will propose dismissal, but then give the appellant an opportunity to obtain and file the final order within the time provided for responding to the calendar notice. Here, although we conclude that the December 10, 2003, order was not a final order or judgment consistent with *Montoya* and Rule 1–054(B)(1) as to Dr. Burstein, the January 30, 2004, order, which dismissed Dr. Burstein's claim against Plaintiff, did constitute a final judgment since that order resolved all claims before the court. This situation may be viewed analogously to the portion of Rule 12–201(A) providing that an appeal filed after the announcement of a decision, but before the final judgment is filed, will be treated as filed after the final judgment. Therefore, because we seek to determine cases on their merits, *see Trujillo v. Serrano*, 117 N.M. 273, 276, 871 P.2d 369, 372 (1994), we conclude that because part of the case was final on December 10, 2003, and the final judgment as to Dr. Burstein was issued on January 30, 2004, at about the same time that the record proper was filed in this Court and well before this Court's first calendar notice, a dismissal based on a premature appeal or Plaintiff's failure to file a notice of appeal after January 30, 2004, would be the sort of technicality that should not result in a dismissal. Thus, we hold that this Court has jurisdiction to review Plaintiff's appeal as to Dr. Burstein.

**2.** *The district court did not err when it dismissed Plaintiff's breach of contract claim because Dr. Burstein never entered into the contract from which the breach of contract claim originates.*

{16} In this case, the district court dismissed Plaintiff's second amended com-

plaint based on Defendants' motions to dismiss. A district court's decision to dismiss a complaint for failure to state a claim is reviewed de novo. *Wallis v. Smith*, 2001–NMCA–017, ¶ 6, 130 N.M. 214, 22 P.3d 682. A Rule 1–012(B)(6) motion to dismiss tests the legal sufficiency of the complaint, not the factual allegations of the pleadings which, for the purposes of ruling on the motion, court must accept as true. *Coleman v. Eddy Potash, Inc.*, 120 N.M. 645, 650, 905 P.2d 185, 190 (1995), *overruled on other grounds by Delgado v. Phelps Dodge Chino, Inc.*, 2001–NMSC–034, ¶ 23 n. 3, 131 N.M. 272, 34 P.3d 1148. A complaint should not be dismissed unless there is a total failure to allege some matter essential to the relief sought. *Las Luminarias of the N.M. Council of the Blind v. Isengard*, 92 N.M. 297, 300, 587 P.2d 444, 447 (Ct.App.1978). For purposes of a motion to dismiss, we accept all well-pleaded facts as true and question whether the plaintiff might prevail under any state of facts provable under the claim. *N.M. Life Ins. Guar. Ass'n v. Quinn & Co.*, 111 N.M. 750, 753, 809 P.2d 1278, 1281 (1991).

{17} Plaintiff contends that the district court erred when it dismissed Plaintiff's breach of contract claim against Dr. Burstein. Plaintiff bases its breach of contract claim on a Compliance Acknowledgment Form signed by Dr. Burstein. Plaintiff claims that Dr. Burstein agreed in his Compliance Acknowledgment Form to abide by CIGNA's policies which required him, according to Plaintiff's briefs, "to keep information about Lovelace's business confidential, and not disclose such information to competitors or to any other person." A copy of the Compliance Acknowledgment Form appears in the record. The district court, after reviewing the breach of contract claim contained in the second amended complaint as well as the Compliance Acknowledgment Form, dismissed the claim.

{18} Our review of the record indicates a conflict between Plaintiff's pleadings and the Compliance Acknowledgment Form. Plaintiff alleges that Dr. Burstein "agreed" in the Compliance Acknowledgment Form to abide by CIGNA policies; yet we find no language within the Compliance Acknowledgment Form that would indicate that Dr. Burstein entered into any agreement with CIGNA. The relevant portion of the Compliance Acknowledgment Form provides only that Dr. Burstein "received, read, and understood" a CIGNA booklet entitled "Doing Things the Right Way—An Employee Guide to CIGNA Policies and Ethics," a CIGNA business and practices policy, and the employee responsibility section of the Lovelace Employee Resources Information Handbook. It is important to note that Plaintiff argues that the agreement that Dr. Burstein allegedly entered into was contained within the Compliance Acknowledgment Form itself and not the publications mentioned within the Compliance Acknowledgment Form. Moreover, to the extent that the record contains Dr. Burstein's employment and confidentiality agreements, they are agreements with Lovelace, not with either Plaintiff or CIGNA.

{19} Contrary to Plaintiff's second amended complaint, we conclude that the Compliance Acknowledgment form contains no language indicating Dr. Burstein entered into an agreement. In *Cecil v. Hydorn*, 725 S.W.2d 781, 782 (Tex.Ct.App.1987), the court held that where an obligation in the pleading does not conform to the writing exhibited as a basis thereof, the document rather than the pleading controls. Similarly, in *Davis v. Nichols*, 124 S.W.2d 881, 884 (Tex.Ct.App. 1939), the court held that:

It is always the duty of the plaintiff to allege facts sufficient to make out a prima facie cause of action, and where his declarations or complaint[s] are sufficient, but in conflict with the written instruments copied, in extenso, in his petition, such declarations or complaint[s] are mere conclusions of the pleader and must yield to the terms and conditions of the written instruments.

Here, although Plaintiff's claims assert that there was an agreement entered into by Dr. Burstein, the Compliance Acknowledgment Form does not indicate such an agreement. Following the rule outlined in *Cecil* and *Davis*, which appears consistent with New Mexico law, *see* Rule 1–009(I) NMRA (requiring any document to be served with the pleading when the document is the basis for

an action or defense referred to within the pleading), we conclude that no such agreement existed. Thus, having determined that Dr. Burstein did not enter into an agreement through the Compliance Acknowledgment Form, we determine that the Compliance Acknowledgment Form was not a contract. *Trujillo v. Glen Falls Ins. Co.*, 88 N.M. 279, 281, 540 P.2d 209, 211 (1975) (holding that in order for a contract to be valid, the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon). Therefore, because we determine that the Compliance Acknowledgment Form was not a contract, we hold that the district court did not err when it dismissed Plaintiff's breach of contract claim. *See Joseph E. Montoya & Assocs. v. State*, 103 N.M. 224, 226, 704 P.2d 1100, 1102 (1985) (ruling that where there is no contract, there can be no breach and no breach of contract cause of action).

{20} However, even if we were to hold that the Compliance Acknowledgment Form constituted a contract or that the employment and confidentiality agreements were contracts, we would still conclude that the district court did not err when it dismissed the breach of contract claim because our review of the record indicates that Plaintiff was not a party to the Compliance Acknowledgment Form or the other agreements. As stated above, the relevant portion of the Compliance Acknowledgment Form indicated that Dr. Burstein had "received, read, and understood" two CIGNA publications and a portion of the Lovelace Employee Resources Information Handbook. Furthermore, the actual title of the document is "Lovelace Health Systems Compliance Acknowledgment Form." The other agreements were similarly with Lovelace. Plaintiff is neither mentioned nor named within the documents. Plaintiff does not argue that it is a third party beneficiary of the contract, but rather that Dr. Burstein owed Plaintiff a contractual duty under the Compliance Acknowledgment Form because Plaintiff is a CIGNA entity. We do not agree.

{21} In this case, CIGNA Corporation, CIGNA Health Corporation, Plaintiff, and Lovelace are all separate corporations.

CIGNA Health Corporation owned 100% of Plaintiff's stocks. Yet, a corporation and a shareholder, even a sole shareholder, are separate entities for legal purposes. *London v. Bruskas*, 64 N.M. 73, 78, 324 P.2d 424, 427 (1958). Here, CIGNA was named in the Compliance Acknowledgment Form, and therefore if any entity but Lovelace was a party to the contract, it was CIGNA as an individual entity. Plaintiff, on the other hand, as a separate entity from CIGNA, was not a party to the Compliance Acknowledgment Form. Plaintiff, also a separate entity from Lovelace, was not a party to the employment agreement or confidentiality agreement. Therefore, we conclude that the district court did not err when it dismissed Plaintiff's breach of contract claim because we do not find a contract, and even if there was a contract, Plaintiff was not a party to the contract. *Fleet Mortgage Corp. v. Schuster*, 112 N.M. 48, 49, 811 P.2d 81, 82 (1991) (holding that generally one who is not a party to a contract cannot maintain suit upon the contract).

3. *The district court did not err when it dismissed the tortious interference with existing contractual relationships claim because Plaintiff lacked standing to bring the claim.*

{22} Plaintiff contends that Defendants tortiously interfered with Plaintiff's purchase agreement with Ardent, which had set December 31, 2002, as the closing date for Plaintiff's sale of Lovelace stock to Ardent. Plaintiff argues that Defendants interfered with the purchase agreement by soliciting and attempting to solicit Lovelace radiologists. Furthermore, Plaintiff asserts that Defendants knew that the purchase of Lovelace stock was scheduled to be closed on December 31, 2002, and attempted to solicit Lovelace radiologists prior to the closing date so that Defendants would be able to force Ardent into contracting with them for radiology services. As stated in the facts above, Ardent indicated to Plaintiff that it would not close on the purchase of Lovelace stock until the situation regarding Lovelace's radiologists was resolved. Plaintiff contends that due to Defendants' attempts to solicit the radiologists, the closing date for the sale

of stock was delayed until January 15, 2003, which resulted in damages of at least $400,000 in interest on the multi-million dollar sale.

■ {23} Defendants, on the other hand, argue that Plaintiff lacks standing to bring any claims against them. "Whether one is the real party in interest is to be determined by whether one is the owner of the right being enforced and is in a position to discharge the defendant from the liability being asserted in the suit." *Jesko v. Stauffer Chem. Co.,* 89 N.M. 786, 790, 558 P.2d 55, 59 (Ct.App.1976). Defendants claim that, in this case, the real party in interest is Lovelace and not Plaintiff. Defendants direct our attention to *Marchman v. NCNB Texas National Bank,* 120 N.M. 74, 898 P.2d 709 (1995), as support for their argument that Plaintiff is not the real party in interest in this case. Our reading of *Marchman* leads us to agree with Defendants that Plaintiff lacks standing to assert the claims against Defendants.

{24} *Marchman* involved a lawsuit filed by a sole shareholder of a corporation, in which the shareholder alleged that he had suffered financial damages due to the injuries inflicted upon the corporation by the defendant. 120 N.M. at 79–80, 898 P.2d at 714–15. In concluding that the shareholder did not have standing to bring claims against the defendant, our Supreme Court in *Marchman* stated:

> A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets. In this situation, it has been consistently held that the primary wrong is to the corporate body and, accordingly, that the shareholder, experiencing no direct harm, possesses no primary right to sue.

*Id.* at 81, 898 P.2d at 716 (internal quotation marks and citation omitted). The Court in *Marchman* ruled that "[a] corporation and a shareholder—even a sole shareholder—are separate entities, and a shareholder of a cor-

poration does not have an individual right of action against a third person for damages that result because of an injury to the corporation." *Id.*

{25} The *Marchman* Court did identify two exceptions to the general rule that a shareholder cannot sue individually for injuries to his or her corporation. *Id.* at 81–82, 898 P.2d at 716–17. Those exceptions are where there is a special duty, such as a contractual duty, between the defendant and the shareholder, or when the shareholder suffers an injury separate and distinct from that suffered by other shareholders. *Id.*

{26} Therefore, in accordance with *Marchman,* the framework in which to analyze Plaintiff's claims against Defendants is to first ask whether Plaintiff's injury is an indirect harm arising primarily from an injury inflicted upon Lovelace by Defendants. We then proceed to analyze whether Plaintiff's damages are a diminution in the value of Lovelace's stock resulting from the impairment of corporate assets. If the first two steps in the process are answered in the affirmative, then Plaintiff lacks standing to sue unless we conclude that Defendants had a special duty to Plaintiff or Plaintiff suffered an injury separate and distinct from other shareholders. *Id.* Keeping this analytical process in mind, we now turn our attention to Plaintiff's claim that Defendants tortiously interfered with Plaintiff's contract with Ardent.

{27} Plaintiff's claims assert that Defendants interfered with Plaintiff's contract with Ardent by "soliciting and attempting to solicit and hire Lovelace's radiologists." Thus, Plaintiff admits that any injury it suffered was primarily due to Defendants' actions aimed at Lovelace or Lovelace radiologists, rather than Plaintiff. Plaintiff's complaint does not allege any injury that would have been inflicted upon Plaintiff but for the injury to Lovelace. Therefore, the first step in the *Marchman* process is satisfied in this case because Plaintiff's claim arises primarily from a direct injury aimed at Lovelace, which led to Plaintiff's being indirectly harmed.

{28} We must now inquire whether Defendants' actions caused an impairment to the

corporation's assets, which led to a diminution in the value of Plaintiff's corporate stock. Here, Plaintiff admits that Defendants' attempts to hire all of the Lovelace radiologists would "negatively impact" the Lovelace corporation. Thus, Plaintiff admits that Defendants' actions caused damage to Lovelace, the corporate asset in this case. Furthermore, Plaintiff admits that because of Defendants' actions aimed at Lovelace, Ardent refused to carry through with its agreement to purchase all of Plaintiff's stock in Lovelace. Therefore, prior to Defendants' actions against Lovelace, the value of Plaintiff's stock was valued at almost a quarter of a billion dollars; yet after Defendants' actions, the value of the stock was decreased so much that Ardent would not pay what it had previously agreed to due to the damage that had been done to the corporate asset. Furthermore, the interest on the purchase price, which accumulated due to the delay in the closing of the purchase, was a direct result of Ardent's concern that any injury to the corporation be resolved prior to the closing on the sale for the agreed-upon amount. Ardent's concern reinforces the conclusion that the primary injury here was to Lovelace, the corporation. Thus, there was a diminution in the value of the stock due to the damage caused by Defendants to Plaintiff's asset, and the second step of the process outlined in *Marchman* is satisfied. Therefore, having determined that Plaintiff's claim of tortious interference with an existing contract is primarily based on a direct injury to Lovelace and not Plaintiff, and also having concluded that the injury led to damages to the corporate asset, which led to a decrease in the value of Plaintiff's stock, we hold that Plaintiff lacks standing to bring a cause of action in this case unless Plaintiff can show that one of the two *Marchman* exceptions applies in this case.

{29} Plaintiff argues that it falls within one of the two exceptions of *Marchman* because it suffered an injury that is separate and distinct from Lovelace. Plaintiff misreads *Marchman*. In *Marchman,* the Court did not note an exception for a shareholder who suffers an injury that is separate and distinct from the corporation, but rather recognized an exception for a shareholder who suffers

an injury separate and distinct from other shareholders. *Id.* at 82, 898 P.2d at 717. Here, because Plaintiff holds 100% of the shares in Lovelace, it cannot claim an injury separate and distinct from other shareholders. *Id.* (holding that the shareholder in that case could not claim a separate and distinct injury because the shareholder held 100% of the stock). Therefore, we do not agree that Plaintiff suffered the type of separate and distinct injury that is provided for as an exception in *Marchman.* Furthermore, Plaintiff does not argue that either X–Ray or Dr. Burstein owed Plaintiff a special duty. Therefore, we hold that Plaintiff does not fall within either of the exceptions provided for in *Marchman* and thus does not have standing to bring a claim against Defendants for tortious interference with an existing contract. In so holding, we do not mean to state that there is not a cause of action presented within the fact pattern of this case; we simply conclude that if there is a cause of action, that claim belongs to Lovelace and not Plaintiff.

4. *The district court did not err when it dismissed the negligent misrepresentation claim because Plaintiff lacks standing to bring the claim and Plaintiff failed to state a claim upon which relief could be granted.*

{30} Plaintiff contends that the district court erred when it dismissed Plaintiff's claim for negligent misrepresentation. We disagree. To sufficiently state a claim for negligent misrepresentation, Plaintiff must claim that (1) Defendants made a material misrepresentation of fact to Plaintiff, (2) Plaintiff relied upon such representation, (3) Defendants knew the representation was false at the time it was made or made the representation recklessly, and (4) Defendants intended to induce Plaintiff to rely on such representation. *Saylor v. Valles,* 2003–NMCA–037, ¶ 17, 133 N.M. 432, 63 P.3d 1152.

{31} Here, Plaintiff does not assert in its second amended complaint that Defendants made any representation to Plaintiff. Plaintiff does claim, however, that Defendants made representations to Lovelace ra-

diologists. It is true that the first element of the uniform jury instruction on negligent misrepresentation does not require that the misrepresentation be made to the plaintiff. UJI 13–1632 NMRA. It is clear, however, from reading the instruction as a whole that the instruction contemplates that the misrepresentation will be made to the plaintiff in the ordinary case. The first element of the instruction does not contain the requirement that the misrepresentation be made to the plaintiff to allow for the possibility, explained in the commentary, that a "defendant[,] in the course of his business . . . supplies incorrect information for the guidance of others in their business transaction[ ]." Committee comment to UJI 13–1632 (internal quotation marks and citation omitted). In this situation, the instruction requires that the defendant intend that the information be received by the plaintiff or a group of persons of which plaintiff was a member, and the instruction's fourth element requires the plaintiff to rely on the information in all events. UJI 13–1632. Here there is no indication that Plaintiff relied on any of Defendant's representations or that Defendants intended any information to be received by Plaintiff. Therefore, Plaintiff's negligent misrepresentation claim fails for failure to state a claim on which relief could be granted. See Saylor, 2003–NMCA–037, ¶ 17, 133 N.M. 432, 63 P.3d 1152.

{32} Furthermore, we conclude that Plaintiff lacks standing to bring this claim against Defendants. Once again we rely on Marchman for support that a shareholder does not acquire standing to maintain an action in its own right, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is an indirect harm. 120 N.M. at 81, 898 P.2d at 716. Here, Plaintiff pled that Defendants made negligent misrepresentations to Lovelace radiologists to induce those radiologists to leave their employment with Lovelace. Thus, Plaintiff admits in its complaint that the direct injury in this case was aimed at Lovelace or Lovelace's employees rather than Plaintiff. Once again, our review of Plaintiff's complaint does not indicate that Plaintiff alleges any injury that it would have suffered had it not been for the direct injury

inflicted upon Lovelace or its employees. Thus, any injury that Plaintiff asserts is an indirect harm caused by the direct injury inflicted upon Lovelace or its employees. Additionally, Ardent's refusal to carry through with the purchase agreement to buy all of Lovelace's stock served as a diminution in the value of Plaintiff's stock, which was a result of the direct injury that Defendants inflicted upon the corporation. Therefore, we conclude that the district court did not err when it dismissed Plaintiff's negligent misrepresentation claim because Plaintiff failed to state a claim on which relief could be granted and Plaintiff also lacked standing to bring the claim.

5. *The district court did not err when it dismissed the prima facie tort claim because Plaintiff lacked standing to bring the claim and Plaintiff failed to state a claim upon which relief could be granted.*

{33} Plaintiff argues that the district court erred when it dismissed Plaintiff's prima facie tort claim. We disagree. First, we believe that Plaintiff's prima facie tort claim must suffer the same fate as the prima facie tort claim in *Marchman*. In that case, the plaintiffs alleged prima facie tort along with claims for breach of covenants of good faith and fair dealing and tortious interference with business relationships, similar to the claims in this case. *Marchman*, 120 N.M. at 80, 898 P.2d at 715. The Court there did not distinguish the prima facie tort claim from the other claims and affirmed the dismissal of them all for lack of standing. *Id.* at 80–83, 898 P.2d at 715–18.

{34} In addition, we question whether the prima facie tort claim should be allowed to go forward in this case. To state a claim for prima facie tort, a plaintiff must allege (1) an intentional and lawful act, (2) with the intent to injure the plaintiff, (3) injury to the plaintiff as a result of an intentional act, and (4) the absence of sufficient justification for the injurious act. *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990).

{35} In *Hill v. Cray Research*, 864 F.Supp. 1070, 1080 (D.N.M.1991), the court dismissed the plaintiff's prima facie tort claim because the court determined that a claim for prima facie tort should not lie when the pleaded factual basis is within the scope of an established tort. The court in *Hill* noted that the plaintiff's prima facie tort claim was supported by identical facts that were used to support the other causes of action within the plaintiff's compliant. *Id.* The *Hill* court stated that the plaintiff, in support of the prima facie tort cause of action, "merely realleges the facts in support of the other causes of action, adding only a bare recital of the elements of prima facie tort relating to intent and justification." *Id.* The rationale used by the *Hill* court in dismissing the prima facie tort claim has also been articulated by this Court in *Stock v. Grantham*, 1998–NMCA–081, ¶¶ 38–39, 125 N.M. 564, 964 P.2d 125, in which we held that a prima facie tort claim may not be used as a means of avoiding the more stringent requirements of other torts. In *Stock*, this Court upheld the lower court's dismissal of the plaintiff's prima facie tort claim partly because the factual basis used to support the claim within the pleadings duplicated other claims. *Id.*

{36} Here, as in *Hill*, Plaintiff does not assert any separate factual basis to support its prima facie tort claim. The only facts used to support the claim are those incorporated from other causes of action mentioned within the complaint. Thus, even if there was standing, we would likely conclude, as we did in *Stock*, that the district court did not err in dismissing Plaintiff's prima facie tort claim because the cause of action duplicates other claims made by Plaintiff. As the court in *Hill* stated, "the value and validity of prima facie tort as a separate cause of action depends upon its ability to offer relief for the intentional infliction of harm where the actor's otherwise lawful conduct cannot be brought within other more traditional categories of liability." *Hill*, 864 F.Supp. at 1080.

{37} Finally, since we have held that Plaintiff has failed to state a claim for any underlying cause of action that would support a civil conspiracy claim, the district court was correct in dismissing that claim as well. *See Ettenson v. Burke*, 2001–NMCA–003, ¶ 23, 130 N.M. 67, 17 P.3d 440 (holding that a civil conspiracy claim requires an underlying claim independent of the conspiracy cause of action).

## CONCLUSION

{38} We affirm the district court's order granting dismissal of Plaintiff's claims.

{39} **IT IS SO ORDERED.**

I CONCUR: A. JOSEPH ALARID, Judge.

JONATHAN B. SUTIN, Judge (concurring in part and dissenting in part).

SUTIN, Judge (concurring in part and dissenting in part).

{40} I concur in all of the majority opinion except that part affirming the dismissal of Plaintiff's claim for interest lost because of the postponement of the closing date of the sale. I do not read *Marchman v. NCNB Texas National Bank*, 120 N.M. 74, 898 P.2d 709 (1995), to preclude Plaintiff's claim for interest. *Marchman* should not be read so broadly. Lovelace was not the owner of the right to or claim for lost interest. Lovelace could not discharge any liability for that lost interest. There exists no contention or evidence that this alleged injury to Plaintiff was inflicted on Lovelace with only an indirect injury to Plaintiff resulting from a diminution in value of Plaintiff's corporate shares. The same wrongful conduct could independently and separately (1) impair Lovelace's corporate assets, and (2) cause Ardent to hesitate to close and to delay closing, resulting in Plaintiff's lost interest. Bringing Plaintiff's lost interest claim within *Marchman* is too great a stretch of *Marchman*. I therefore respectfully dissent as to the majority's affirmance based on *Marchman* of the district court's dismissal of Plaintiff's claim of lost interest.